The next case before the court, Case No. 172513, is a decision out of the District Court, the District of New Jersey. Supernus Pharmaceuticals, Inc. v. TWi Pharmaceuticals, Inc. Mr. Misurk? Misurk, yes. Okay. And do you also want to try to keep five minutes for rebuttal? I will try, yes. Nobody's been doing very well with that so far, but we'll see what we get. Good morning. May it please the Court, my name is Don Misurk. I represent TWi Pharmaceuticals in this matter. Each asserted claim of the patents in suit requires, one, an agent that enhances the solubility of oxycarbazepine, and two, a matrix that is homogeneous. Now, I'd like to begin with the solubility-enhancing agent issue. Now, Supernus argues that the accused agent in TWi's drug product is an agent that enhances the solubility of oxycarbazepine. I'm using accused agent as directed by the Court's order. However, the specifications of the patents in suit explicitly state that the accused agent is not either a solubility agent or a release-promoting agent. Now, thus, it was clear error for the District Court to find the accused agent to be a solubility-enhancing agent as used in TWi's antiproduct. The District Court had an answer to that allegation that you've just made, right? Didn't the District Court say, well, I look at the specification and there's some and-or language in there, and I'm going to read that as being, it's not one thing or another, right? Yes, and that's the error. I mean, the District Court said that I'm going to read and-or to mean just and. Now, the District Court has a lot of discretion in these cases to find facts, but one thing the District Court does not have discretion to do is to ignore the plain language of the patent specification, which says repeatedly that when we say enhanced formulations in the patent, it's at column four, you can direct yourself to column four of the patent. It says the patentee defines enhanced formulations to be formulations that include, I guess we can read it right at the beginning of page four. It says based on human data, improvements were made to the formulations by incorporating solubility enhancers and-or release promoting excipients. Parent. Such formulation are referred to as enhanced formulations. So what the District Court did and what Superintendent said is they point to other parts of the specification where they say by the invention, we claim or we're including combinations of release promoters and solubility enhancing agents as encompassed by the invention. Well, yeah, that's the and part of and-or. So the District Court clearly dismissed all the accused agent is actually used in examples of the patent, found in, I think it's examples one of the patent, in table one. The accused agent is actually used in these examples. These examples are described as not working and these examples are described as not containing a, they're not enhanced and they're not containing a release promoter slash solubility agent. That is on, well, it's the passage we just read and it is the description of the examples on column two at the bottom of the page beginning at line 60. Figure one shows the dissolution profiles of the three examples, CRF, CRM, and CRS. Those are the examples listed in table one. Oxycarbazepine formulations containing no solubility slash release enhancer. And the District Court said that slash means either-or. It means and-or. But the District Court said either-or, right? The District Court said it meant and. It meant and. It didn't mean either-or. It meant and. You had to have both. And so the District Court said, what you're saying about example one isn't right, Mr. Your view is the slash means and. I'm sorry? Your view is that the backslash means and. Not my view, Your Honor. English language view is that we said in our brief, it's the dictionary says slash means and-or. The case law says and-or. The slash means and-or. And the patent itself says the slash means and-or. When you read every other example of the patent, column four, lines one to four, as we read, I think our brief, reply brief especially, or our brief that goes through all the places in the patent where it says column five, lines 57-ish to 59, it says as these polymers swell, they form a homogeneous matrix structure that maintains its shape during drug release and serves as a carrier for the drug solubility enhancers and-or release promoters. I mean, throughout the entire specification, the slash means and-or. And the patent, and the District Court just did not have discretion to say that and-or means just and. Well, what is your response? Is the compound capable of being an enhancer? I'm sorry? Is the compound capable of being an enhancer in the real world? Well, as far as the evidence shows, no. The only evidence that shows that the accused agent has the capability of being a solubility agent for oxcarbazepine is the solubility data that they submitted in this case pursuant to the example, or what's said here is a solubility agent to test in example three. But I was wondering whether, even if your argument was good that the patent shows that this product, this thing is not an enhancer for their patent, it's capable of enhancing in your product. Well, I don't, I mean, all I can talk about is the evidence in this case, Your Honor. The evidence in this case is that there is a passage in the patent that says, low molecular weight versions of this accused agent can be solubility enhancing agents. But if you look at the actual test, when the patentees tested the low molecular weight agents in paragraph, in table three in column ten, the only thing that they tested that made the solubility of oxcarbazepine worse was this particular accused agent. It didn't make it a little worse, it made it a lot worse. So you have the actual testing in table three that says that lower molecular versions of this accused agent, which were what was preferred as a solubility enhancing agent, made the situation much worse. The district court ignored all of this. Yeah, I just wanted to ask you a question. I understand your emphasis on the language and the specification, but just to make sure I understand your argument, are you saying, if I agree with your interpretation of how that's, of the specification, are you saying that that trumps all other evidence? Because I know that the district court considered other evidence, including the test results of experts, including your own expert, in making the determination that she made. And so would the specification then trump that evidence? Or how are you just saying that there's clear error because of failure to consider the statement of the specification? Well, I'd say there's clear error because of the basic error, okay? Secondly, I'd say that it's pretty strong evidence and very difficult to overcome if the patent itself says that an accused agent is not a solubility enhancer. Now, whether there's some set of facts in which somebody could get away with it, I don't know, but here- But the district court laid out a huge amount of evidence. I mean, this was not just one point that the district court made. The district court relied on substantial evidence in the record. And as Judge Stolz said, even evidence from your own expert. Well, Your Honor, I just disagree on that for several reasons. One, the district court did have a lengthy discussion of evidence. But if you look through the evidence, most of the evidence was just picking and choosing statements about the excipient as in general, not in the specific context of whether it actually had a beneficial effect on the solubility of oxcarbazepine. Secondly, the issue, the district court was supposed to- there was an agreement about what the claim term solubility enhancer meant, which was that the effect on solubility was greater than de minimis. Now, the district court said, well, wait a minute, you know, even though she recognized that that was how we got through a claim construction debate earlier in the case, she then said, well, I don't see anything in the patent that says that any particular amount of improvement is required for something to be a solubility-enhancing agent. And here, it was this negligible difference. And we introduced- But she made a lot of findings that make it clear that she was rejecting that de minimis argument. Well, she couldn't reject the de minimis argument because the de minimis- I mean, she said, her findings, I mean, her findings were specific. She said, it's more, right? She said it's more, and I don't find anything in the patent or specification that says it has to be anything just more. And while she has a lot of findings, Your Honor, this is where we're kind of infected by the old activist case that I know Judge Stahl and Judge Clevenger, you were on the panel that heard the prior case involving these same patents and guarding activists, and the evidence on this issue was so dramatically different than it was in the activist case. In the activist case, when they tested the accused agent- Well, but, I mean, it's pretty extreme for you to say we have to send this back to another judge because she can't possibly see through the fact that it's different evidence. I mean, she said repeatedly that she knows that her determination has to be based on this record. She said it was being based on this record. And she made a lot of specific findings only citing to this record. So for you to come here and say, oh, well, this judge obviously was blinded by the fact that she was in a different case that had similar circumstances, I don't think that's a fair characterization of what this judge did. Well, Your Honor, I mean, I can, I don't have to, all I have to prove is that there was an error in the finding. I mean, I don't really have to prove the motivation. I do believe that despite the district court saying so many times that she was not considering evidence from the prior case, she did. She referenced evidence from the activist case regarding whether or not the Xtellar product was, the Xtellar product was tested and compared in some of the testing from their experts, and she referenced it. So if she was so careful about not thinking about the prior thing, then she would have. And then secondly, we asked her about how, the proper way to use the activist decision. And we challenged that the district court misused the prior decision, didn't understand this court's precedent about what weight to give to a prior decision. And she made specific findings that she wasn't giving undue weight to the prior decision. But then, while she said, well, what she described as the appropriate weight does not comport with what this court says is the appropriate weight to give to a prior decision. In the Mendenhall case, Gillette case, which I know Judge Clevenger had been a participant to, you just, it's a red flag. That's the amount of weight. You can't give weight to the findings, the factual findings in the case. Can you tell me what page you're relying on for where she referred to somebody in the other case? Certainly, it's- Is that the same page that you gave in your briefing? Yes. Something beyond that. No. That was the example where she, and we referenced it in our brief, yes. Okay, so it's just that one example. Now, on the de minimis thing, just going back to that for a minute. On page A57, this is her decision. And she says, TWI argues that such minor increases in salubility are insignificant and insufficient. The court disagrees. And then she talks about Dr. Child's statistical analysis. And she says that he said that's statistically significant. And why, even though she didn't use the magic words, de minimis, why doesn't this discussion on page 57 show that she actually considered de minimis? Well, two things. Because the court said specifically that she didn't see anything in the patent that required any amount of improvement. So, she's made a direct finding that's opposite to what I think you're arguing about, whether de minimis needed to be found. And secondly, on page 57- I can see you're discussing the concept of it. Well, and we kind of, we looked at this- She explicitly disagreed with your position that it wasn't statistically significant, right? No. She says, we're responding to this. Statistically significant, as we point in our brief, statistical significance is irrelevant. Statistical significance, as our reply brief goes into, does not matter. You have to find practical significance. Statistical significance has nothing to do with whether there's any practical significance of a difference in the change. So, your point is that this isn't discussing the de minimis requirement because it's not talking about practical significance. Well, correct. It's like de minimis means practically different. And what we did discuss, this section of the opinion, because superannus tries to cobble together some kinds of other findings to say that the court actually did do it, and we explained in our brief how statistical significance is not what the claim term was defined to mean, and it was- What if we disagreed with you on that? Just hypothetically. Sorry? Say we disagreed with you on that, hypothetically. Would you agree that the discussion here on page A57 is getting across the idea of whether something's de minimis or not, or significant or not? I don't think so, because it doesn't address any practical effect. Okay. It doesn't- Okay. You're out of time. I'm going to give you two minutes for rebuttal. Okay. Thank you, Your Honor. Of course, we still stand on our brief on homogeneous matrix issues. Thank you. Good morning, and may it please the court. I'd like to start off by correcting a misstatement. Counsel repeatedly made the statement that the specification throughout states that the accused agent is not a sciability enhancer. It never says that. There is only one place in the entire patent that uses the word- the words without sciability enhancer. That's at column three, lines 14 to 19, APPX 155, and that passage has- refers to formulations that do not include the accused agent and have no relevance here. Again, that site is column three, lines 14 to 19. That is the only statement in this specification of any of the asserted patents that uses the words without sciability enhancer. It's describing figure five. It's describing formulations that do not include the accused agent. Now, just to clarify this concept with table three, and the end or argument, I would direct the court's attention to column three of the 898 patent. Again, we're, we're staying with APPX 155. This is at column three, lines 54 to 61, and I, and I really do think it's worth reading. Quote, it is the object of this invention to provide controlled release oxcarbazepine formulations suitable for once a day administration. So let's stop there. The focus of this patent is to- I apologize. Yes. We're in column four. I'm in column, no problem. I'm in column three, APPX 155 if you're using that. Okay. And I'm at lines 54 to 61. Okay, thank you. So it is, it is the, it is the object of this invention to provide controlled release oxcarbazepine formulations suitable for once a day administration. Stopping there, we're dealing with oxcarbazepine, a very difficult to dissolve, difficult to formulate drug. The inventors of the patents in suit were able to create a once a day formulation. That is the centerpiece of this invention. The paragraph continues, quote, it is an additional object of the invention to incorporate a combination of solubility enhancing excipients and or release promoting agents into the formulations, and this is important, to enhance the bioavailability of oxcarbazepine and its derivatives. Such compositions are referred to as enhanced formulations. An enhanced formulation in the context of this patent means a formulation that has enhanced bioavailability, which is just a word for saying it's the oxcarbazepine is available to the human body. It enhances the bioavailability. If you have an enhanced formulation, bioavailability is enhanced such that you can achieve once a day administration. If you have a non-enhanced formulation, which is table one, which was the focus of Appellant's argument. Non-enhanced in table one means you do not have sufficient enhancement of bioavailability to achieve once a day administration. What's the evidence of that? The direct sites figures one, two, and three. Well, what's your response that solubility enhancing excipients and release promoting excipients can be one or the other in terms of accomplishing enhancement? Yes, so if you look at the description of the non-enhanced formulations, it uses the forward slash, an admittedly less than clear punctuation. But even in Appellant's own citation to a legal style manual, the forward slash is described as a grammatical abomination that can mean and, or, or, and, or. That's in the reference that Appellant cited, right? Here, the district court found, as a matter of fact, entitled to deference based on voluminous documentary and expert and inventor testimony, that what was meant in the description of the non-enhanced formulations was that it did not contain that critical synergistic combination of release promoters and enhancers, okay? And I think it's important also for me to correct a potential mischaracterization of this de minimis argument if you have no more questions on the end or issue. So, Appellant argues that the district court clearly erred by not addressing or making fact findings to confirm that any increase in citability was not something more or less de minimis. The district court's opinion in this case completely contradicts that assertion. Number one, there is testing conducted by both parties' experts, Dr. Shile and Dr. Birkland, TWI's own expert. Dr. Birkland tested, he ran the industry standard test described in example three, table three. He ran that test almost three dozen times, every single time. But what's your response to your friend on the other side who said that really, he didn't use these words, but I think he was saying there's a difference between qualitative and quantitative impact. In other words, just because it's statistically significant didn't mean it actually produced a practical result. That's a very good point, your honor. The district court found that the citability testing in this case demonstrated a 26 to 195% increase. That is a finding of fact. Most importantly to this concept of de minimis is what you may recall from the opinion, Mr. Chen's formulation document. Mr. Chen's formulation document is a document from a TWI formulator created, an appellant's formulator created before this litigation began, well before it began. This formulator took the accused agent, okay? He made a whole bunch of tablets. He put increasing amounts of the accused agent into his tablets. When he did that, he found, quote, higher accused agent equals faster hydration. If you look to table one, claim one, hydration promotion is the benchmark for that, but you don't have to rely on claim one. There is ample expert testimony that was credited by the district court to support that. So, TWI formulator adds more of the accused agent, sees increased hydration, increased citability. More importantly, that same formulator takes the accused agent out of the test samples, and in his own words, the result is a dead end. That is real world practical ramifications of having differing amounts of the accused agent and taking the accused agent out or keeping it in. Real world test. This is a rare piece of evidence in these Hatch-Waxman cases that shows that the accused infringer had used the accused ingredient and actually found before the Markman proceedings in this case. They knew that we were asserting that the accused agent satisfied claim element 1C. I think we have to take a step back and realize that what we're addressing on appeal today is not a claim construction issue. Appellants had superannuos infringement contentions before the Markman proceedings in this case. They knew that we were asserting that the accused agent satisfied claim element 1C. They never argued for specification disclaimer or a negative limitation. You know, 1C means an agent that increases citability but is not the accused agent. This was never raised during Markman proceedings. So what we're dealing with now is an application of a claim construction, a weighing of the evidence here. So this is a clear error standard, and I don't want to get lost because what we're hearing essentially is a disclaimer argument, but it's being repackaged as an application of the claim construction to the facts in this case. You're going to hear . . . What's your response to Mr. Berserk's argument that, and I gave him a hard time about this, but the reality is district judges are human beings and, you know, the district judge walks into this and she said, wait, I tried a whole case on this not that long ago. I get this science. I mean, what is your response to the fact that she did not limit herself solely to this record and instead based it on what Mr. Berserk would say was not as good of a record for purposes of the generic in the Ectavius case? Yes. The critical question was already asked of Appellant's counsel. Point me to a section in the trial opinion where a substantive ruling was based on evidence from the Ectavius case. It does not exist. The district court and the briefing on this, I hope, has been clarified by us filling out the quotations because there are truncated quotations that when read in full, and we did that, we tried to correct the record in that regard, maybe half a dozen times she reiterated the fact that she was relying solely on evidence in this case. Now, the citation to so-called activist evidence is an introduction to Dr. Bugay, who was Supernus' chemical imaging expert. And in passing, she says he tested TWI's product. He tested this. He tested Supernus' product. It so happens that he didn't test Supernus' product in this case because there wasn't an obviousness case. We didn't need to show nexus. He did test it in the other case. But he also used a validation protocol from the activist case, and he used the same protocol, and that was fine. There was no dispute that that was proper. At the end of the day, that was an introduction to an expert and what he did in this case, followed by paragraph after paragraph of the results of his chemical images of the TWI tablets in this case. In fact, the pictures are put in her opinion in color. This is, the trial opinion is completely devoid of a single instance of Judge Bung relying on activist evidence to support a substantive ruling in this case. And that would be my response. And I think Your Honor was there already in asking for any additional citations. Okay? Unless there are other questions, thank you for your time. Just to respond to a few of the points, at the beginning of Superintendent's argument here, they tried to argue that, they went back to the Andorra issue and tried to argue that the combination is what, they tried to explain again that somehow a combination is what was meant by enhanced. And what they cited to is the section at the beginning of column three, and they said that because there were certain examples that were referenced with saying those specifically did not just have a solubility enhancer in them, that that somehow negated the statements in the, regarding to the examples that did have the accused agent in it, that those examples were without a solubility slash release promoter, solubility agent slash, which is just nonsense. Because the specific example that contains the accused agent is described in the patent, in specific reference to the example, and in the general sense of the specification, as being examples that do not have either a release promoter or a solubility enhancing agent. And people looking at the specification were entitled to rely on that. And then I think Mr. Giove made a concession that use of the slash was a little inartful, I guess, they made the concession. And he said, well, all the witnesses testified what it meant. The inventor testified what he meant by that and everything else. Well, that's completely inappropriate. And it's completely inappropriate for the district court to rely on inventor testimony about what he meant. People, the public looking at the specification, won't have the benefit of superness's witnesses to help them and guide them through understanding the specification. And if there is an ambiguity in the specification. I agree strongly with the argument that what you're really making here is a disclaimer argument. I don't, I mean, I don't think it's a, I mean, this is not a, well, let's go, it's not a claim construction argument, number one. Because I don't know how this would crop up as a claim, you know, we said a salubility enhancer is something that enhances salubility in more than a de minimis, in more than a de minimis way, and they agreed. As far as disclaimer argument, I don't think that it's a disclaimer argument. We, except whatever you call it, it is what it is. We made the argument, the district court considered it. They didn't say that we, it was a disclaimer argument or whatever at any point in time. And it's not, it's if they make a factual statement, if the patent team makes a factual statement in the patent, then we should, they should be bound by that fact at some later time. I mean, they can't go ahead and say in their patent that this is not a salubility enhancer, not a salubility enhancer, and then to come and accuse us of saying our agent, when we use it, is a salubility enhancer. And I think the point would be is that we never waived it because obviously we're talking about it and we had a ton of evidence and done a discussion in the record about what the specification meant. Which the district court just kind of dismissed because she says, I took care of this in the activist case and I'm not going to consider it again. So that was inappropriate. Okay, you're out of time. Okay. Thank you, Your Honor. I appreciate your indulgence.